IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MF NUT CO., LLC, fka MAC FARMS OF HAWAII, LLC, | Civil No. CV 11-00004 KSC (Declaratory Judgment) |
| Plaintiff, | MEMORANDUM IN SUPPORT OF MOTION |
| vs. | |
| CONTINENTAL CASUALTY COMPANY, | |
| Defendant. | |

## MEMORANDUM IN SUPPORT OF MOTION

### I.  INTRODUCTION

Plaintiff MF NUT CO., LLC, fka MAC FARMS OF HAWAII, LLC ("Mac Farms") seeks partial summary judgment as to Defendant Continental Casualty Company's ("Continental's") duty to defend Mac Farms in an underlying employment action (the "Underlying Lawsuit") brought by the Equal Employment Opportunity Commission (the "EEOC").  This motion is based upon the ground, that the factual allegations in the Underlying Lawsuit raise the possibility, that Continental will be liable to indemnify Plaintiff for at least some of the underlying claims.  Such possibility obligates Defendant, as a matter of law, to defend Mac Farms from all of the claims asserted in the Underlying Lawsuit.

### II.  BACKGROUND

#### A.  The Policy

Continental issued an "Epack" Insurance Policy, No. 287240960, to Mac Farms with an effective date of May 1, 2008 (the "Policy").  PSCS at ¶ 1.[1]  As originally issued, the policy period was to run from May 1, 2008, to June 27, 2009.  However, Endorsement No. 16, effective August 11, 2008, amended the declarations to change the Policy's expiration date to August 11, 2008.  The Policy

---

[1] "PSCS" refers to Plaintiff's Separate Concise Statement of Facts filed herewith pursuant to L.R. 56.1.

was further amended via Endorsement No. 19, also effective August 11, 2008, which provided for an extended reporting period from August 11, 2008, through August 11, 2010.

The Policy included, *inter alia*, Employment Practices Liability ("EPL") coverage with a liability limit of $1 million, inclusive of defense costs, with a $25,000 retention.  PSCS at ¶ 2.  Under the heading "General Terms and Conditions," the Policy provided, in relevant part, as follows:

## I.    TERMS AND CONDITIONS

The terms and conditions of each **Coverage Part** apply only to that **Coverage Part** and shall not apply to any other **Coverage Part**. If any provision in the General Terms & Conditions is inconsistent or in conflict with the terms and conditions of any **Coverage Part**, the terms and conditions of such **Coverage Part** shall control for purposes of that **Coverage Part**.

## II.    DEFINITIONS

For purposes of this Policy, words in bold have the meaning set forth below. However, any bolded word referenced in these General Terms & Conditions but defined in a **Coverage Part** shall, for purposes of coverage under that **Coverage Part**, have the meaning set forth in that **Coverage Part**.

. . . .

7.    **Interrelated Wrongful Acts** means any **Wrongful Acts** which are logically or causally connected by reason of any

2

common fact, circumstance, situation, transaction or event.

. . . .

## III.   EXTENDED REPORTING PERIOD

1.   If **Named Company** cancels or non-renews this Policy or if the Insurer decides not to offer any renewal terms for this Policy, the **Named Company** shall have the right to purchase, upon payment of an additional premium equal to 75% of the annualized **Policy Premium**, an extension of this Policy for a period of 12 months immediately following the end of the **Policy Period**, but only with respect to any **Wrongful Act** committed before the earlier of the end of the **Policy Period** or the effective date of any **Takeover**;

This period shall be referred to as the Extended Reporting Period.

## VI.   DEFENSE/SETTLEMENT/ALLOCATION

1.   Defense of **Claims**

The Insurer has the right and duty to defend all **Claims**, even if the allegations are groundless, false or fraudulent. The Insurer shall have the right to appoint counsel and to make such investigation and defense of a **Claim** as it deems necessary. Alternatively the Insurer may, at its option, give its written consent to the defense of any such **Claim** by the **Named Company Insureds**. The Insurer's obligation to defend any **Claim** or pay any **Loss**, including **Defense Costs**, shall be completely fulfilled and

3

extinguished if the limit of liability has been exhausted by payment of **Loss**.

. . . .

[5.]   Allocation

If a **Claim** made against the **Named Company Insureds** includes both covered and uncovered matters, or if a **Claim** is made against **Named Company Insureds** who are extended coverage therefor and others (including **Named Company Insureds**) who are not extended coverage therefor, the **Named Company Insureds** agree that coverage will apply as follows:

**Defense Costs**: reasonable and necessary **Defense Costs** incurred by such **Named Company Insured** from such **Claim** shall be considered covered **Loss**; and

**Loss** other than **Defense Costs**: all remaining loss incurred by such **Named Company Insured** from such **Claim** shall be allocated between covered **Loss** and uncovered loss based upon the relative legal exposures of the parties to such matters.

. . . .

## VII.   NOTICE/DATE OF CLAIM/ INTERRELATED CLAIM CLAUSE

. . . .

4.   Except as provided in 2 above, a **Claim** shall be deemed made:

      a.     in the case of a civil, criminal, administrative, regulatory or investigative proceeding or arbitration, on the earliest of the date of service upon or other receipt by any **Named Company Insured** of a complaint, indictment, notice of charge or similar document against the **Named Company Insured** in such proceeding or arbitration;

      b.     in the case of an investigation, on the earliest of the date of service upon or other receipt by the **Insured Person** of a written notice or subpoena from the investigating authority identifying such **Insured Person** as an individual against whom a formal proceeding may be commenced;

  . . . .

5.     More than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be considered as one **Claim** which shall be deemed made on the earlier of:

      a.     the date on which the earliest such **Claim** was first made, or

      b.     the first date valid notice was given by the **Named Company Insureds** to the Insurer under this Policy of any **Wrongful Act** or under any prior policy of any **Wrongful Act** or any fact, circumstance, situation, event or transaction which underlies any such **Claim**.

  . . . .

5

PSCS at ¶ 3.

The Policy's EPL Coverage Part included the following insuring language:

### I.    INSURING AGREEMENT

The Insurer shall pay on behalf of **Named Company**, any **Subsidiary** or any **Insured Person Loss** resulting from any **Claim** first made against the **Named Company Insureds** during the **Policy Period** or the Extended Reporting Period, if applicable, by or on behalf of;

a.    a natural person who is an **Employee** or applicant for employment for a **Wrongful Employment Practice.**

b.    any other natural person, but solely for a **Wrongful Employment Practice** as described in paragraph c and d of the definition of **Wrongful Employment Practice**.

PSCS at ¶ 4.

The EPL Coverage Part also included the following relevant definitions:

### II.    DEFINITIONS

For purposes of coverage under this Coverage Part:

1.    **Claim** means:

a.    a written demand for monetary damages, or

      b.    a formal civil, administrative, or regulatory proceeding or investigation or an arbitration,

against any **Named Company Insured**, alleging a **Wrongful Employment Practice**, including any appeal therefrom.

2.    **EEOC Proceeding** means an investigative proceeding before the Equal Employment Opportunity Commission or an adjudicatory or investigative proceeding before any similar federal, state or local government body whose purpose is to address **Wrongful Employment Practices.**

. . . .

5.    **Loss** means damages (including back pay and front pay), settlements, judgments (including any award of pre-judgment and post-judgment interest) and **Defense Costs** for which **Named Company**, any **Subsidiary** or any **Insured Person** is legally obligated to pay on account of a covered **Claim**. **Loss** shall not include: (i) criminal or civil fines or penalties imposed by law; (ii) taxes; (iii) any amounts for which there is no legal recourse against **Named Company**, any **Subsidiary** or the **Insured Persons**; (iv) matters which are uninsurable under the law pursuant to which this Policy shall be construed or (v) any unpaid salary, bonus, hourly pay, overtime pay, severance pay, retirement benefits, vacation days or sick days. **Loss** shall include punitive, exemplary or multiple damages, if insurable, to the fullest extent permitted by any applicable law. Where the **Named Company Insureds** reasonably

7

determine that punitive, exemplary or multiple damages are insurable under any applicable law, the Insurer shall not challenge that determination of insurability.

6.    **Wrongful Act** means any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty committed or attempted by the **Insured Persons** in their capacity as such or by **Named Company** or any **Subsidiary**.

7.    **Wrongful Employment Practice** means any **Wrongful Act** constituting or relating to:

. . . .

c.    violation of any federal, state or local laws (whether common-law or statutory) concerning employment or discrimination in employment, including the Americans with Disabilities Act of 1992, the Civil Rights Act of 1991, the Age Discrimination in Employment Act of 1967, Title VII of the Civil Rights Act of 1964 and the Civil Rights Act of 1866.

. . . .

g.    retaliation against employees for the exercise of any legally protected right or for engaging in any legally protected activity;

. . . .

8

        i.       failure to adopt adequate workplace or employment policies and procedures.

PSCS at ¶ 5.

The EPL Coverage Part also includes the following language under Section III., Exclusions:

1.    <u>Exclusions Applicable to All **Loss**</u>

The Insurer shall not be liable to pay any **Loss** under this Coverage Part in connection with any **Claim** made against **Named Company**, any **Subsidiary** or **Insured Persons**:

. . . .

c.    based upon, directly or indirectly arising out of, in any way involving or constituting any civil, criminal, administrative or regulatory proceeding (including an **EEOC Proceeding**), investigation or arbitration against any of the **Named Company Insureds**:

(1)    pending prior to or on the Prior or Pending Date set forth in the Coverage Schedule of the Declarations; or

(2)    which has been the subject of any notice given under any prior policy, regardless whether such prior policy affords coverage for such proceeding, investigation, or arbitration;

or any fact, circumstance, situation, transaction or event underlying or alleged in such proceeding, investigation or arbitration;

9

> provided however, if such prior proceeding is an **EEOC Proceeding**, this exclusion shall not apply to any **Claim** by **Employees** who did not bring such prior **EEOC Proceeding**.

PSCS at ¶ 6.

### B.    The EEOC Charges

Prior to August 2008, Mac Farms grew and harvested macadamia nuts on its farm in South Kona on the Island of Hawaii.  In or around September 2004, Mac Farms contracted with Global Horizons, Inc., a California corporation, d/b/a Agri Labor LLC ("Global Horizons") to provide seasonal farm labor to supplement Mac Farms' workforce.  Global Horizons provided Mac Farms with laborers from October 2004 through March 2007.

On or about April 18, 2006, three Global Horizons employees filed charges of discrimination against Global Horizons and Mac Farms with the U.S. Equal Employment Opportunity Commission (the "EEOC").  Between April 18, 2006, and August 13, 2008, an additional 29 Charging Parties filed charges against Mac Farms. The Charging Parties alleged national origin discrimination and retaliation for protected activity, both in violation of Title VII of the Civil Rights Act of 1964, as amended.  PSCS at ¶ 7.

### C.     The Tender

In a letter dated August 6, 2008, to Continental, counsel for Mac Farms tendered the defense of 31 EEOC charges filed by employees of Global Horizons who had worked on Mac Farms' properties.  Copies of the charges and responses, which reflected filing dates both before and after the effective date of the Policy, were enclosed with the tender letter.  PSCS at ¶ 8.

In a telephone conversation, on, or about, August 28, 2008, Bryna J. Stiefel, Esq., Claims Manager for Continental, advised Mac Farms' counsel that Continental was accepting the tender and would pay for Mac Farms' defense by its existing counsel, the law firm of Goodsill Anderson Quinn & Stifel, LLP (the "Goodsill Firm").  PSCS at ¶ 9.

On November 21, 2008, the Goodsill Firm wrote to Ms. Stiefel confirming that Continental had retained it to defend Mac Farms.  PSCS at ¶ 10. Between September 4, 2008, and July 9, 2009, the Goodsill Firm tendered the defense of an additional 10 EEOC charges to Continental on behalf of Mac Farms, bringing the total number of charges to 41.  PSCS at ¶ 11.

The Goodsill Firm, thereafter, continued to defend Mac Farms in connection with the EEOC charges, including responding to requests for information from the EEOC.  The Goodsill Firm submitted its invoices for services to Continental.  Although there was a delay in payment of some of the invoices,

11

Continental never disputed that the Policy afforded coverage for the subject claims and did not reserve its rights to later deny coverage.  PSCS at ¶ 12.[2]

On, or about, July 23, 2010, the EEOC issued a determination as to eight of the charges, concluding that it had reason to believe that Mac Farms had engaged in illegal discrimination.  PSCS at ¶ 15.  The Goodsill Firm forwarded a copy of the EEOC's determination to Ms. Stiefel, and on or about August 3, 2010, Ms. Stiefel advised the Goodsill Firm, that Continental would be issuing a reservation of rights.  PSCS at ¶ 16.  This was the first notice that Mac Farms or its counsel received that Continental was disputing coverage.  It came almost two years after Continental unconditionally accepted Mac Farms' tender.  PSCS at ¶ 17.

On, or about, August 6, 2010, the EEOC issued its determination as to the remaining charges.  PSCS at ¶ 18.  On August 27, 2010, the EEOC sent Mac Farms and Global Horizons a conciliation proposal calling for, among other things, a $12,865,000.00 monetary settlement.  PSCS at ¶ 19.

---

[2] Although Continental maintains that it did send a reservation of rights letter, on, or about, October 23, 2008, to Mac Farms, Ms. Stiefel admitted during her deposition that the letter was addressed to a former executive, whom she knew no longer worked at Mac Farms, and that the proper contact was Mr. Gilbrech, which she allegedly overlooked.  She also knew or should have known that Mr. Gilbrech was in Tennesse and not Hawaii. *See* Deposition of Bryna Stiefel (the "Stiefel Depo") at 52:5-53:8 and Exhibit 5 attached thereto. PSCS at ¶ 13.  Ms. Stiefel also admitted that because the alleged reservation of rights letter was not sent via certified mail, she had no way to know whether anyone at Mac Farms ever received it.  *See id.* at 49:23-50:2.  PSCS at ¶ 14.

The Goodsill Firm made repeated attempts to discuss the EEOC's proposal with Continental.  However, Continental avoided any discussion of the proposal, other than to request that Mac Farms' counsel obtain an extension from the EEOC to respond to the conciliation proposal.  PSCS at ¶ 20.

Ms. Stiefel led Mac Farms' counsel to believe that Continental was studying the EEOC's proposal and considering a response.  In fact, Continental used the delay to "review" and, ultimately, deny coverage.  PSCS at ¶ 21.  On September 14, 2010, more than two years after Continental agreed, without reservation, to defend Mac Farms, Ms. Stiefel advised Mac Farms' counsel by telephone that Continental would be denying coverage and withdrawing its defense.  PSCS at ¶ 22.  At the time, Ms. Stiefel offered no explanation for the abrupt change in the insurer's position.

On September 27, 2010, Continental issued a formal letter of denial to Mac Farms, in care of Mac Farms' general counsel, Baker, Donelson, Bearman, Caldwell & Berkowitz, PC.  Continental's denial was based upon the following grounds: (1) that each of the 41 charges arise out of the same "Wrongful Acts"; (2) that such wrongful acts constitute "Interrelated Wrongful Acts" as defined in the Policy; (3) that all of the charges comprise a single claim; and (4) pursuant to Section VII.5. of the Policy's General Terms and Conditions, all of the charges shall be deemed made on the date of the filing of the earliest charge, i.e., on April

18, 2006.  Continental maintains that because this date is prior to the effective date

of the Policy, there is no coverage for Mac Farms' claim.  PSCS at ¶ 23.

In her deposition, Ms. Stiefel admitted that Continental's coverage

position was based solely upon the allegations on the face of the EEOC charges,

and that she conducted no factual investigation of her own, other than a cursory

Google search:

> 21  Q. Did CNA or Continental do any independent
> 22 fact investigation into any of the allegations in the
> 23 EEOC charges?
> 24 A. Not until around that time period that the
> 25 FBI investigation -- that we were told about the FBI
> . . . .
> 2  investigation.
> 3 Q. This was around August of 2010?
> 4 A. Correct.
> 5 Q. And then what happened at that point?
> 6 A. Started doing some general searching online
> 7 looking for information, seeing what was going on.
> 8 Q. What sort of information were you looking
> 9 for online? Strike that.
> 10 What sources were you going to online to
> 11 look for information?
> 12 A. Just a general Google search really at
> 13 first.
> 14 Q. Of media reports?
> 15 A. Yeah. Just Googling Mac Farms and the Thai
> 16 workers and FBI investigation.
> 17 Q. Beyond Googling -- it's funny how that's
> 18 become a verb. Beyond Googling, was there any other
> 19 independent factual investigation by CNA?
> 20 A. Not that I recall.
> 21 Q. So in reaching the conclusion in the denial
> 22 letter that the charges involved interrelated wrongful

> 23 acts, was that based entirely on the factual allegations
> 24 on the face of the charges?
> 25 A. Yes.

Stiefel Depo. at 89:21-90:25.  PSCS at ¶ 24.

Ms. Stiefel also admitted that the dates of the various EEOC charges, including those made prior to the inception of the Policy, were evident from the face of the charges themselves, and that she received copies of the charges soon after Mac Farms tendered the claim to Continental.  But she claimed she never looked at them until nearly two years after she received them:

> 22 At the time they came in, did you review
> 23 the charges?
> 24 A. Yes.
> 25 Q. Did you note the dates that the charges had
> . . . .
> 2  been filed?
> 3 A. On a few of them.
> 4 Q. And the copies of the charges included
> 5 charges filed prior to the effective date of the policy;
> 6 is that correct?
> 7 A. Yes.
> 8 Q. Did you note that at the time?
> 9 A. No.
> 10 Q. Do you know why not?
> 11 A. It was just something I overlooked. There
> 12 were a lot of charges. They were all exactly the same,
> 13 had the same allegations, and I flipped through, saw
> 14 that they were the same, and put the pile of charges in
> 15 the file. The ones I did notice had been in 2008.

Stiefel Depo. at 30:22-31:15.  PSCS at ¶ 25.

15

In addition, Mac Farms' counsel sent Ms. Stiefel an initial status report dated November 21, 2008, which specifically noted, on the first page of the text of the body of the letter, that the first charges were filed on, or around, April 18, 2006 (i.e., more than two years before the effective date of the Policy).  Ms. Stiefel claims she overlooked this as well:

> 16 Q. This appears to be an initial status report
> 17 on the claim; is that correct?
> 18 A. Yes.
> 19 Q. Do you recall receiving this?
> 20 A. Yes.
> 21 Q. When you received it, did you review it at
> 22 the time?
> 23 A. Yes.
> 24 Q. Looking on page two toward the bottom of
> 25 the page under "Procedural History," it notes that on or
> . . . .
>
> 2 around April 18, 2006, and then it names some
> 3 Charging Parties or charging parties -- I'm not going to try
> 4 to repeat the names here because I'll just mangle it --
> 5 that filed charges on April 18, 2006, and then it
> 6 further down notes from April 18, 2006 through August
> 7 13, 2008, an additional 29 individuals filed charges of
> 8 discrimination with the EEOC against Mac Farms.
> 9 Do you see that?
> 10 A. Yes.
> 11 Q. Earlier, we discussed when you became aware
> 12 that some of the charges that comprised the claim here
> 13 were filed before the effective date of the policy.
> 14 When you reviewed this letter, did you take
> 15 note of the fact that Ms. Petrus was pointing out that
> 16 some of these charges were in fact filed in 2006?
> 17 A. That was something I overlooked.

Stiefel Depo. at 73:16-74:17.  PSCS at ¶ 26.

16

### D.    The Underlying Lawsuit

On April 19, 2011, the EEOC filed a lawsuit against various defendants, including Mac Farms and Global Horizons.  The EEOC alleged that Global Horizons: harassed and intimidated the Charging Parties on a regular basis; regularly threatened the Charging Parties with deportation, arrest, suspension, and/or physical violence; unlawfully confiscated the Charging Parties' identification documents;  subjected the Charging Parties to uninhabitable housing, insufficient food and kitchen facilities, inadequate pay, significant gaps in work, visa and certification violations, suspension, deportation, and/or physical violence; and subjected the Charging Parties to intolerable working conditions that resulted in constructive discharge.  PSCS at ¶ 27.

With regard to Mac Farms, the Complaint alleged only that Mac Farms "either engaged in, knew of, or should have known of the unlawful employment practices and pattern or practice of such unlawful acts" allegedly engaged in by Global Horizons. The Complaint sought a permanent injunction against all alleged unlawful activities as well as compensatory and punitive damages and costs of suit.

The EEOC has since amended its Complaint twice.  In its Second Amended Complaint, filed on December 16, 2011, the EEOC further alleged that Global Horizons and Mac Farms jointly controlled the Charging Parties' work,

housing, transportation, and access to food; jointly supervised the Charging Parties and/or Mac Farms exercised successively higher authority over Global and the Charging Parties; jointly determined the pay rates or the methods of payment; jointly held the right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers; and jointly participated in the preparation of payroll and the payment of wages.  PSCS at ¶ 28.

## III.   ARGUMENT

### A.   Summary Judgment Standard

Summary judgment is appropriate only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Accordingly, "[o]nly admissible evidence may be considered in deciding a motion for summary judgment." *Miller v. Glenn Miller Prods., Inc.,* 454 F.3d 975, 988 (9th Cir.2006).

A moving party has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.,* 210 F.3d 1099, 1102 (9th Cir.2000). The burden

initially falls on the moving party to identify for the court "those portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp.,* 477 U.S. at 323); *accord Miller,* 454 F.3d at 987. "A fact is material if it could affect the outcome of the suit under the governing substantive law." *Miller,* 454 F.3d at 987.  When the moving party meets its initial burden on a summary judgment motion, the "burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial." *Miller,* 454 F.3d at 987. This means that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (footnote omitted). The nonmoving party may not rely on the mere allegations in the pleadings and instead "must set forth specific facts showing that there is a genuine issue for trial." *Porter v. Cal. Dep't of Corr.,* 419 F.3d 885, 891 (9th Cir.2005) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

## B.    General Law of Insurance Contracts

Federal courts sitting in diversity apply state substantive law and federal procedural law. *See Snead v. Metro. Prop. & Cas. Ins. Co.,* 237 F.3d 1080, 1090 (9th Cir.2001). When interpreting state law, a federal court is bound by the

decisions of a state's highest court. *Ariz. Elec. Power Coop. v. Berkeley,* 59 F.3d 988, 991 (9th Cir.1995). In the absence of a governing state decision, a federal court attempts to predict how the highest state court would decide the issue, using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance. *Id.; see also Burlington Ins. Co. v. Oceanic Design & Constr., Inc.,* 383 F.3d 940, 944 (9th Cir.2004) ("To the extent this case raises issues of first impression, our court, sitting in diversity, must use its best judgment to predict how the Hawaii Supreme Court would decide the issue." (quotation and brackets omitted)).

Under Hawaii law, general rules of contract construction apply to the interpretation of insurance contracts. *Dawes v. First Ins. Co. of Haw.,* 77 Hawai'i 117, 121, 883 P.2d 38, 42 (1994). Hawaii law requires that an insurance policy be read as a whole and construed in accordance with the plain meaning of its terms, unless it appears that a different meaning is intended. *Id.* at 121, 883 P.2d at 42; *First Ins. Co. of Haw. v. State,* 66 Haw. 413, 423, 665 P.2d 648, 655 (Haw.1983); *see also* Haw.Rev.Stat. § 431:10-237 ("[e]very insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy").

Because insurance contracts are contracts of adhesion, they must be construed liberally in favor of the insured, and any ambiguity must be resolved

against the insurer. Put another way, the rule is that policies are to be construed in accordance with the reasonable expectations of a layperson. *Dawes,* 77 Hawai'i at 131, 883 P.2d at 42.

"Hawaii insurance law provides for a broad duty to defend arising whenever the pleadings raise a potential for indemnification liability of the insurer to the insured." *Burlington,* 383 F.3d at 944; *First Ins. Co. of Hawaii, Inc. v. State of Hawaii,* 66 Haw. 413, 420, 665 P.2d 648, 653 (1983). "The duty to defend exists irrespective of whether the insurer is ultimately found not liable to the insured and is based on the possibility for coverage, even if remote, determined at the time suit is filed." *Burlington,* 383 F.3d at 944; *see also First Ins.,* 66 Haw. at 420, 665 P.2d at 653. Furthermore, when a suit raises a potential for indemnification liability of the insured for even one claim, the insurer has the duty to accept the defense of the entire suit even though other claims of the complaint may fall outside the policy's scope. *See Burlington,* 383 F.3d at 944; *First Ins.,* 66 Haw. at 417, 665 P.2d at 652.

### C.   Because There is a Potential for Coverage, Continental Has a Duty to Defend Mac Farms

An insurer must employ "a good-faith analysis of all information known to the insured or all information reasonably ascertainable by inquiry and investigation[ ]" to determine whether the possibility of coverage under a policy exists.  *Hart v. Ticor Title Ins. Co.*, 126 Haw. 448, 272 P.3d 1215 (Haw. 2012) (citing *Standard Oil Co. of Cal. v. Hawaiian Ins. & Guar. Co. Ltd.,* 65 Haw. 521,

527, 654 P.2d 1345, 1349 (1982)). "All doubts as to whether a duty to defend exists are resolved against the insurer and in favor of the insured." *Sentinel Ins. Co. Ltd. v. First Ins. Co. of Hawaii, Ltd.*, 76 Haw. 277, 875 P.2d 894 (Haw. 1994) (quoting *Trizec Prop., Inc. v. Biltmore Constr. Co., Inc.,* 767 F.2d 810, 812 (11th Cir.1985)) (brackets omitted).

An insurer, in determining whether the third party's action raises a potential for coverage and thus implicates the insurer's duty to defend, must investigate beyond the third party's pleadings when (1) the allegations in the pleadings should alert the insurer that there is a potential for coverage; (2) the allegations differ from facts the insurer knows or can readily determine; or (3) the allegations are ambiguous. *Bayudan v. Tradewind Ins. Co.*, 87 Haw. 379, 957 P.2d 1061 (Haw.App. 1998).

The Policy defines "interrelated wrongful acts" as wrongful acts that are "logically or causally connected by reason of any common fact, circumstance, situation, transaction or event."  Not surprisingly, numerous courts have found such language ambiguous. *See, e.g., American Home Assur. Co. v. Allen*,  814 N.E.2d 662 (Ind.App. 2004) ((holding that policy's aggregate limit rather than per occurrence limit applied to multiple claims against insurance agent for misrepresentation and reasoning that word "interrelated" necessarily implied a "mutual relationship" between the claims and not simply similar facts); *McCuen v.*

*American Casualty Co.,* 946 F.2d 1401 (8th Cir.1991) (concluding that the terms "interrelated" and "similar" are "so elastic, so lacking in concrete content, that they import into the contract . . . substantial ambiguities" and therefore affirming the district court's determination that each of 17 loan transactions to three different borrowers was a separate act for purposes of determining whether policy's per occurrence limits or aggregate limit applied); *Home Insurance Co. of Illinois v. Spectrum Information Technologies, Inc.*, 930 F.Supp. 825, 848 (E.D.N.Y.1996) (expansive phrases such as "interrelated" or "continuous" wrongful acts must have some practical boundary); *Sigma Financial Corp. v. American International Specialty Lines Insurance Co.,* 200 F.Supp.2d 697 (E.D.Mich.2001) ("while many situations may be 'related'-connected in some manner-significantly fewer situations will be 'interrelated'-involving a mutual relationship").

The 41 EEOC charges pending against Mac Farms at the time Continental denied coverage involved 41 different Global Horizon employees who worked at Mac Farms during different time periods. The Charging Parties alleged disparate treatment, discrimination, and retaliation. As such, the EEOC charges depend on facts specific to each employee, i.e., how was he or she subjected to different terms and conditions of employment? How was the employee harassed or intimidated? What protected activity did he or she engage in? How did the employer retaliate? The allegations in each Charge of Discrimination and in the

23

EEOC's Second Amended Complaint are exceedingly vague.  This vagueness precludes a determination that the alleged conduct underlying each of the charges is "logically or causally connected."[3]  Accordingly, Continental can neither show that the charges all arise from "interrelated wrongful acts" nor deem the charges as having all been filed on the same date as the first charge in 2006.

Indeed, the language of the Policy itself strongly suggests that separate EEOC charges brought at different times by different employees should *not* be deemed "interrelated."  Exclusion 1.c.(2) in the EPL Coverage Part provides that Continental shall not be liable for a loss that has been the subject of any notice given under any prior policy.  The exclusion includes an important exception, however, providing, that "if such prior proceeding is an **EEOC Proceeding**, this exclusion shall not apply to any **Claim** by **Employees** who did not bring such prior **EEOC Proceeding**."  This language effectively acknowledges that separate charges of discrimination brought by separate employees involve necessarily distinct facts and cannot be presumed to be "interrelated." At the very least, this language renders the definition of "interrelated wrongful acts" in the Policy ambiguous as applied to the claims at issue here. Based upon the allegations in the

---

[3] Under Hawaii law, an insurer may *not* rely upon extrinsic facts that may be subject to dispute in the underlying action as a basis for refusing an insured's tender of defense of an action.  *Dairy Road Partners v. Island Ins. Co., Ltd.*, 92 Haw. 398, 421-22, 992 P.2d 93, at 116-17 (Haw. 2000).

charges, many of which were, in fact, filed after the effective date of the Policy, Continental clearly has a continuing duty to provide Mac Farms with a defense.

### D.    Continental is Estopped from Disclaiming a Duty to Defend

"[I]f a liability insurer, with knowledge of a ground of forfeiture or noncoverage under the policy, assumes and conducts the defense of an action brought against the insured, without disclaiming liability and giving notice of its reservation of rights, it is thereafter precluded in an action upon the policy from setting up such ground of forfeiture or noncoverage. In other words, the insurer's unconditional defense of an action brought against its insured constitutes waiver of the terms of the policy and an estoppel of the insurer to assert such grounds." *AIG Hawaii Ins. Co. v. Smith*, 78 Haw. 174, 177, 891 P.2d 261, 264 (Haw. 1995) (quoting 44 Am.Jur.2d *Insurance* § 1423 (1982) (footnotes omitted)).   An insurance company may initially assume the unconditional defense of its insured while it performs its own investigation to determine whether coverage exists. However, once the insurer receives information concerning the possible absence of coverage, the insurer must promptly serve the insured with a reservation of rights. *Smith*, 78 Haw. at 177, 891 P.2d at 264 (citing 7C Appleman, *Insurance Law and Practice* § 4693 (1979)).

Continental unequivocally accepted Mac Farms' tender in August 2008 and provided it with a defense for two years without once raising a question

25

as to coverage or reserving its rights to later deny coverage.  Continental knew or should have known at the time of the tender that the first charges against Mac Farms were filed with the EEOC *before* the effective date of the Policy. Mac Farms' counsel provided Continental with both the original dated charge documents and a status report expressly noting that the first charges were filed before the effective date of the Policy.

Nothing transpired in the two years after the original tender that would have any bearing on Continental's coverage position. Yet, Continental waited until September 2010 to pull Mac Farms' defense, without warning and at a time when a conciliation proposal from the EEOC was pending, and Mac Farms, its insured, was relying upon Continental's input and assistance.  Continental's actions effectively deprived Mac Farms of any opportunity to resolve the case early, before referral to the EEOC's regional counsel and the filing of a civil complaint. The timing of Continental's actions could thus not have been more prejudicial to its insured, Mac Farms', interests.

Based upon the foregoing, Continental has waived and/or is estopped from denying coverage in this case.

## IV.   CONCLUSION

Neither the original EEOC charges nor the pleadings in the lawsuit brought against Mac Farms by the EEOC unambiguously preclude coverage in this

26

case.  Because the possibility of coverage exists, Continental has a continuing duty to defend Mac Farms.

Additionally, and as an independent alternative ground to grant Mac Farms' motion, Continental is estopped from denying coverage because it undertook Mac Farms' defense for two years without (an effective) reservation of rights (its alleged reservation of rights letter having been sent to a person, who it knew was no longer employed by Mac Farms, and to an address which it knew was incorrect, finally withdrawing its defense in such a way and at such a time as to cause significant prejudice to Mac Farms.

For all the foregoing reasons, Mac Farms respectfully requests that the Court GRANT its Motion for Partial Summary Judgment and rule that Continental has a duty to resume its defense of Mac Farms and to reimburse it for all defense costs incurred since Continental's withdrawal.

DATED:   Honolulu, Hawaii, May 30, 2012.


/s/David R. Harada-Stone
RICHARD B. MILLER
DAVID R. HARADA-STONE

Attorneys for Plaintiff
MF NUT CO., LLC, fka MAC FARMS OF
HAWAII, LLC